Markman, J.
(concurring). The issue before this Court is whether it will act as a court of law and read the constitution in accord with its plain language, or whether it will effect what many, perhaps even most, in this state view as a “good” thing. The majority opinion, in which I fully join, sets forth its analysis simply and straightforwardly. It does so because the constitutional issue before us is simple and straightforward. I offer this concurrence only to emphasize the extremely important points of disagreement between the majority opinion, and the opinions of the Court of Appeals and my dissenting colleagues.
I. COURT OF APPEALS
Concerning the opinion of the Court of Appeals in this matter, I offer the following thoughts:
(1) The Michigan Constitution excepts from the referendum process “acts making appropriations for state institutions.” It may well have been preferable for the constitution instead to have excepted from the referendum process: (a) merely acts that are necessary in order for the state to “exercise its various functions free from financial embarrassment”; (b) merely acts appropriating monies without which state agencies “would cease to function,” or without which their “continued existence” would be in jeopardy; or (c) merely acts that pertain to the “core functions,” or that are not “peripheral to the core purpose,” of state *392 agencies.[1] However, the constitution did none of these. Rather, it excepted from the referendum process “acts making appropriations for state institutions.” In reading into the constitution these alternative limitations upon the referendum process, the Court of Appeals has, without warrant, substituted its own judgment concerning how the constitution ought to read in place of the judgment of those who actually proposed and ratified the constitution.
(2) In particular, the Court of Appeals has, without warrant, substituted its own judgment for that of “We, the people of the State of Michigan” who “have ordain[ed] and established] this constitution.”[2] “This” constitution is one that, for better or worse, excepts from the referendum process “acts making appropriations for state institutions.” It is not one that excepts from the referendum process a greater or a lesser range of legislative acts, depending upon the personal preferences of individual judges or the political imperatives of the moment.
(3) In a truly remarkable statement, the Court of Appeals asserts:
*393 [E]ven if we were to conclude that the statutory expenditures constituted appropriations for state institutions as contemplated by [the constitution], we would nevertheless hold that the overarching right of the people to their “direct legislative voice” . . . requires that 2000 PA 381 be subject to referendum.
I would respectfully suggest that the “overarching right of the people” is to have the constitution that they have ratified given respect and accorded its proper meaning. The fundamental flaw in the Court of Appeals statement is evident in its very assertion. Who is to say, for example, that this particular “overarching right,” “the right to a direct legislative voice,” is more “overarching” than the right of the people to have the legislative judgment of their elected representatives given effect over the objections of five percent of the electorate? In truth, in a system of constitutional government, we examine the language of the constitution itself to determine which rights are “overarching.” Whether the referendum process or the legislative judgment should prevail in a particular case does not depend upon which right or which value is perceived to be more “overarching” by a judge, but rather upon which result is required by the terms of the constitution itself. There is, in fact, an “overarching right” to a referendum, but only in accordance with the standards of the constitution; otherwise, there is an “overarching right” to have public policy determined by a majority of the people’s democratically elected representatives.
(4) It is hard to imagine a single statement more fundamentally at odds with the genuinely “overarching right” of the people to responsible constitutional government than that of the Court of Appeals. I repeat it, for it evidences a profound misunderstand *394 ing about the proper role of the judiciary that demands response:
[E]ven if we were to conclude that the statutory expenditures constituted appropriations for state institutions as contemplated by [the constitution], we would nevertheless hold that the overarching right of the people to their “direct legislative voice” . . . requires that 2000 PA 381 be subject to referendum.
What this apparently means is that, “[e]ven if we were to conclude” that the constitution stated one thing, the Court of Appeals panel would still abide by its own views in holding that the constitution meant a different thing. Thus, it could be that “[e]ven if we were to conclude” that the constitution prohibited prior restraints on the press, we would “nevertheless hold” that the “overarching right” of persons to a fair trial requires that newspapers not write irresponsibly about high-profile criminal cases. Or it could be that, “[e]ven if we were to conclude” that the constitution prohibited denying criminal defendants a right to a jury trial, we would “nevertheless hold” that the “overarching right” of judicial efficiency requires that exceptions sometimes be made to this requirement. In other words, no matter what the actual language of the constitution, the Court of Appeals panel will, in effect, create a “higher” constitutional law whose requirements will supersede those of the constitution ratified by “we, the people.” This is not law; it is a prescription for judicial domination.
n. JUSTICE CAVANAGH’S DISSENT
Concerning the dissent of Justice Cavanagh in this matter, I offer the following thoughts:
*395 (1) In addition to the various standards fashioned by the Court of Appeals in replacing those set forth by the Michigan Constitution, the dissent adds the standard of “great public significance.” Apparently, the* greater the “public significance” of a law, the more essential it is that a referendum be allowed to proceed, notwithstanding the language of the constitution. For what it is worth, I am in complete agreement that 2000 PA 381 is a matter of “great public significance” and can easily appreciate why its opponents wish to make it the subject of a referendum. Nevertheless, it can be assumed that any measure that becomes the focus of a serious referendum effort will be a matter of “great public significance” and, in any event, the constitution does not make distinctions between those legislative enactments that some justices may view as of “great public significance” and those that are viewed as of lesser significance.
(2) Equally irrelevant to this Court’s constitutional analysis are the dissent’s various references to the “lame-duck” character of the Legislature[3]; the fact that “firearms advocates and persons interested in hunting” are “pitted” against a “coalition of law enforcement, religious, and educational interest”; and the fact that some individual members of the Legislature view their colleagues as having improper motives in attaching an appropriations provision to 2000 PA 381.
*396 (3) The dissent chastises the majority for having “neglected to recite” certain facts in its opinion. With all due respect, the majority has done no such thing. It has merely neglected to “recite” facts that are wholly irrelevant to its legal analysis, as is typically the case in our opinions. The majority, for example, views it as irrelevant for purposes of its legal analysis that the law under consideration is of “great public significance,” or, in particular, that the law relates to a highly divisive political controversy. Rather, the constitution means exactly the same thing whether the law at issue pertains to firearms, to farming irrigation, or to any other conceivable subject matter. Therefore, reciting the details or the political or legislative history of the statute before us, beyond identifying the appropriations that it makes, would add nothing to the constitutional analysis. Furthermore, contrary to what would have been the case if the dissent’s position had prevailed, “future litigants,” concerning whom the dissent expresses such concern, will henceforth be apprised of the unvarying meaning of the constitution, and will not be required to count noses about how many justices view the law at issue in their future case as being of “great public significance,” or whether the appropriations made in their future case involve a “core function” or are essential to the “continued existence” of some state agency.
(4) The dissent describes the majority’s constitutional analysis as one that “focuses narrowly on the superficially straightforward question,” as being “legalistic,” as being “pinched,” and as being “overly literal.” Such descriptions are typical of those uttered when a judge is frustrated in his ability to reach a particular result by the actual language of the law. *397 Contrary to the dissent, the majority does not interpret the constitution “literally” or “legalistically.” There is simply no reasonable alternative interpretation to the words “acts making appropriations for state institutions.” Again, it may well be that the dissent’s formulation of the right of referendum is preferable to that of the constitution. However, such a determination is not for this Court to make — no matter how “publicly significant” a law. As Chief Justice Marshall recognized in Marbury v Madison, nearly two centuries ago, it is the responsibility of the judiciary to say what the law “is,” not what it believes that it “ought” to be.[4]
(5) The dissent’s reference to Justice Cooley’s rules of constitutional interpretation is apt, but misses the point. Constitutional interpretation varies from statutory interpretation principally because constitutional language tends to be more concise, and to relate to broader expressions of principle, than does statutory language. The language of constitutions, therefore, also tends to be more susceptible to multiple interpretations than does the more precise and more thorough language of statutes. Justice Cooley’s rules make clear how, in a constitutional context, broad language and general words are to be given reasonable meaning. When, however, constitutional language is straightforward, such as the eligibility requirements for a member of Congress,[5] or the procedural requirements of the legislative process,[6] we accord such language its plain and ordinary meaning. *398 “[Reasonable minds, the great mass of the people themselves” tend to accord words such plain and ordinary meanings. Contrary to the dissent, Justice Cooley did not assert, in effect, that “apple” can mean “orange,” if a group of citizens could be found who understood it in this sense. Rather, what he asserted was that ambiguous terms, those fairly susceptible to multiple understandings, should be assessed by his rules. The “common understanding” of most words is that they possess their plain and ordinary meanings.[7]
(6) It should be noted that the dissent does not ultimately rest its interpretation upon any specific language or phrase contained in the constitution, since it cannot do so. Instead, it relies upon such amorphous concepts as “the overall approach” to legislation taken by the constitution’s framers and the people who ratified it. But, rather than taking the framers and ratifiers of the constitution at face value and assuming that they intended what they plainly wrote, the dissent manages creatively to conclude that the framers and ratifiers meant something other than what they wrote. On what basis does it reach *399 such a conclusion? Does the dissent identify convincing statements in support of that proposition by the framers? Does the dissent point to evidence that “we, the People” were misled into believing that “acts” or “appropriations” really did not mean “acts” or “appropriations?” Does the dissent offer new historical information that the ratifiers understood that Detroit Automobile Club, and other earlier decisions of this Court, were being reversed by the Constitution of 1963? No, there is no argument of this kind.[8] All that we are left with is that the dissent believes that the drafters of the constitution, and “We, the People” who ratified it, should have adopted the referendum provision that it prefers.[9]
m. JUSTICE WEAVER’S DISSENT
Concerning the dissent of Justice Weaver in this matter, I offer the following thoughts:
*400 (1) The dissent asserts that Detroit Automobile Club stands for the proposition that only appropriations that “enable the state to exercise its various functions free from financial embarrassment,” or without which state agencies would “cease to function,” are excepted from the referendum process. However, Detroit Automobile Club, does not say this at all; rather, it merely stands for the proposition that the Michigan Highway Department is a “state institution.” It does not even purport to address the issue of what constitutes “acts making appropriations.” Of course, even if the decision had said what the dissent asserts, no decision of this Court can permanently transform the plain language of the constitution.
(2) The dissent asserts that “the majority fails to recognize the importance of the referendum, and this Court’s responsibility to protect the people’s power of the referendum, derived from the constitution . . . .” However, a better characterization of this Court’s “responsibility,” in my judgment, is that we have a responsibility to protect the people’s power of referendum as set forth by the constitution, and we have a responsibility to protect the people’s power of representative self-government as set forth by the constitution. Indeed, the principal “responsibility” of this Court is to read the language of the constitution faithfully. If the people wish to modify their constitution, they may do so under the terms of article 12, and the majority will attempt to interpret the modified constitution faithfully. But the majority will not act as a continuing constitutional convention and dilute the people’s right to have their supreme law mean what it says.
*401 IV. JUSTICE KELLY’S DISSENT
Concerning the dissent of Justice Kelly in this matter, I offer the following thoughts:
(1) The dissent contends that the majority “ignores” the meaning of the word “for” as used in the constitutional provision “acts making appropriations for state institutions.” I respectfully disagree. The relevant meaning of “for” in the instant context is “intended to belong to.”[10] Clearly, in this case, the appropriation was “intended to belong to” the Department of State Police. Demonstrating that no word is too straightforward not to be transmuted beyond recognition, the dissent manages to conclude that what the framers and the people meant by using the word “for” was that only “appropriations aimed at satisfying the purpose or reason for which a state institution exists” are excepted from the referendum process. The premise of this interpretation appears to be that there is a meaningful distinction between an agency qua agency, and the functions that are performed by such agency, i.e., that there is some disembodied assemblage of functions that are carried out by an agency that define its “essence” or “core” as distinct from the total array of functions that it is charged by the law with carrying out. This is plainly without any basis. If the Legislature determined tomorrow that the Department of State Police should, in addition to its current responsibilities, be assigned new responsibilities now belonging to the Department of Corrections, monies appropriated for such new responsibilities would be every bit as much “for” the Department of *402 State Police as monies appropriated “for” its current responsibilities. I am aware of no textual or other basis for understanding “for” to mean anything at all different in these circumstances.
(2) The dissent accurately asserts that “[w]e start by examining the provision’s plain meaning as understood by its ratifiers at the time of its adoption.” I agree with that statement and I believe that this is exactly what the majority has done. The dissent has failed to produce a scintilla of evidence to demonstrate that the people of this state in 1963 understood the language “acts making appropriations for state institutions” to mean anything other than what it plainly says.
(3) Because the dissent is unable to produce evidence to contradict the idea that the people intended their constitution to mean what its words convey, in the end, it also relies upon such amorphous concepts as “the fundamental purpose of the general power of referendum” to justify its interpretation of the law. However, there is no “general power” of referendum in Michigan, but only a specific power of referendum as defined by the constitution. And whatever “fundamental purpose” can be discerned to the referendum power, such a purpose must be subordinate to the “fundamental purpose” of a constitution itself, which is that it establishes the ground rules for a system of self-government, and its words, where plain, must be taken seriously.
V. FINAL QUERY FOR THE DISSENTERS
Finally, I would address the following question to each of my dissenting colleagues: Had those who pro *403 posed and ratified our constitution truly intended to limit the referendum power as the majority interprets it, how should they, how could they, have fashioned it any more clearly than they did in article 2, § 9? That is, what words should they have used that they did not?[11]
VI. CONCLUSION
I respectfully believe that the Court of Appeals and my dissenting colleagues, by transforming the plain meaning of the words of the constitution, would engage the judiciary in an exercise far beyond its competence and authority. While I can certainly understand the frustrations of those who disapprove of the substance of 2000 PA 381, such frustrations should not be viewed as a justification for giving a meaning to the constitution that is so irreconcilable with its language.[12]

 The Court of Appeals asserts that these alternative formulations, each of which it has incorporated in its opinion, were set forth by this Court in Detroit Automobile Club v Secretary of State, 230 Mich 623; 203 NW 529 (1925), in the course of our interpreting the predecessor version of the current Michigan Constitution. However, such language, to the extent that it can be discerned at all in Detroit Automobile Club, was set forth in the altogether different context of determining whether the state highway department was or was not a “state institution.” It was not done in the context of determining whether an enactment of the Legislature was an “act[] making appropriations.” Furthermore, this Court in 1925, as in 2001, could not alter the language of the constitution, and it did not purport to do so.

 Const 1963, Preamble (emphasis added).

 The dissent describes the majority as “granting the lame-duck legislative majority the prize it apparently sought . . . .” However, as the dissent well appreciates, judges are not in the business of “granting prizes” to either side of a controversy; rather, they are in the business of interpreting the language of the law and letting the chips fall where they may.

 Marbury v Madison, 5 US (1 Cranch) 137; 2 L Ed 60 (1803).

 Powell v McCormack, 395 US 486; 89 S Ct 1944; 23 L Ed 2d 491 (1969).

 Clinton v New York City, 524 US 417; 118 S Ct 2091; 141 L Ed 2d 393 (1998).

 The dissent’s “generous” reading of the constitution is only “generous” if one starts with the point of view that a referendum should proceed on the law in controversy. If, on the other hand, one wishes to have the law take normal effect, without awaiting the next general election, then perhaps the dissent’s reading might be characterized by some as somewhat less “generous.” Although, in my judgment, the constitution should be interpreted “faithfully,” rather than “generously” or “non-generously,” it is difficult for me to understand how any interpretation can be drawn from the language of the referendum clause, no matter how “generous,” that leads to the conclusion reached by the dissent. It is unclear whether the dissent believes that the msyority has misconstrued “acts” or “making” or “appropriations” or "for” or “state” or “institutions,” or how such words have been misconstrued. In other words, exactly which interpretation of which word by the majority is most “dark” or most “abstruse,” in the dissent’s judgment?

 In lieu, the dissent asserts that the “great mass of the people” would, if asked, “surely suppose” that the language of the referendum clause did not mean what the majority understands. I do not know whether the dissent is right or wrong in this proposition, for it sets forth no evidence in this regard and I am aware of no such evidence. However, at the very least, the dissent is obligated to demonstrate in regard to its assertion: (a) why it should be assumed that the “great mass of the people” did not understand that their words would be taken seriously and accorded their common understanding; and (b) why a substantial majority of the people’s representatives in the Legislature, the overwhelming number of whom had just been reelected and who had been fully apprised by opponents of 2000 PA 381 of the latter’s views on the impropriety of attaching an appropriations provision to this measure, cannot be assumed to have been representing the actual sentiments of the “great mass of the people.”

 The dissent is harsh in its characterization of the Legislature’s “legerdemain” in attaching an appropriations provision to 2000 PA 381. Possibly, this is a deserved characterization. But, any such skills in this regard by the Legislature can hardly compare to the “legerdemain” (or, indeed, the alchemy) on the part of the dissent in transforming an otherwise clear and straightforward statement of law into something of altogether different meaning.

 Random House Webster’s College Dictionary (1991) at 519.

 In this regard, I can recall the member of Congress who, in frustration over a judicial interpretation of a statute that, in his opinion, ignored its plain language, reintroduced the identical statute, but appended at its conclusion, “and we mean it this time!”

 In light of the confusion generated, let me make clear, for what it is worth, that I, as a part of the citizenry of Michigan, would also prefer a broader referendum clause in our constitution, one less susceptible to avoidance by appropriations of the type contained in 2000 PA 381. However, until such a referendum clause is adopted by the prescribed constitutional process, see Const 1963, art 12, I will continue to interpret, as best as I can, the referendum clause that has actually been ratified by the people. Furthermore, let me make clear that I am not oblivious to the debate over the motives of the Legislature in attaching the instant appropriations to 2000 PA 381. However, for the reasons set forth in Chief Justice Corrigan’s concurring opinion, I simply do not believe that such motives are relevant to our constitutional analysis.